NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-04285 (CGM) |
| v. | |
| UBS AG, UBS (Luxembourg) SA, et al., | |
| Defendants. | |

**MEMORANDUM DECISION DENYING THE UBS DEFENDANTS' MOTION TO DISMISS**

**A P P E A R A N C E S :**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
*Attorneys for the UBS Defendants*
By:     Marshall R. King, Esq.

BAKER HOSTETLER LLP

45 Rockefeller Plaza
New York, NY 10111
*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*
By:    Michelle Usitalo, Esq.

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is Defendants', UBS AG, UBS Europe SE (f/k/a UBS

(Luxembourg) S.A.) ("UBS Lux" or "UBS SA"), UBS Fund Services (Luxembourg) S.A.

("UBSFSL"), and UBS Third Party Management Company S.A. ("UBSTPM") (collectively,

"UBS" or the "UBS Defendants"), motion to dismiss the complaint of Irving Picard, the trustee

("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS")

seeking to recover subsequent transfers allegedly consisting of BLMIS customer property.  (Mot.

Dismiss, ECF No. 285).  The UBS Defendants seek dismissal for lack of personal jurisdiction;

for failure to plead actual intent to defraud on the part of BLMIS; and for failure to allege that

they received BLMIS customer property, and they assert the affirmative defenses of the "safe

harbor" and "good faith."  For the reasons set forth herein, the motion to dismiss is denied in its

entirety.

## **Jurisdiction**

This is an adversary proceeding commenced in this Court, in which the main underlying

SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L.*

*Madoff Investment Securities LLC et al.*, No. 08-CV-10791, and has been referred to this Court.

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). This Court has subject matter jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(a), the District Court's Standing Order of Reference, dated July 10, 1984, and the Amended Standing Order of Reference, dated January 31, 2012. In addition, the District Court removed the SIPA liquidation to this Court pursuant to SIPA § 78eee(b)(4), (*see* Order, Civ. 08– 01789 (Bankr. S.D.N.Y. Dec. 15, 2008) ("Main Case"), at ¶ IX (ECF No. 1)), and this Court has jurisdiction under the latter provision. Personal jurisdiction has been contested by three of the Defendants and will be addressed *infra*.

## Background

The Court assumes familiarity with the background of the BLMIS Ponzi scheme operated by Bernard L. Madoff ("Madoff") and its SIPA proceeding. *See Picard v. Citibank, N.A. (In re BLMIS),* 12 F.4th 171, 178–83 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard,* 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022).

This adversary proceeding was filed on November 23, 2010. (Compl., ECF[1] No. 1). The Trustee filed an amended complaint on February 28, 2022 ("Complaint"). (Am. Compl., ECF No. 274). Via the Complaint, the Trustee is seeking to recover transfers of customer property allegedly made by BLMIS to Luxalpha SICAV ("Luxalpha") and Groupement Financier (collectively, the "Feeder Funds"), and then subsequently transferred to the UBS Defendants.

---

[1] Citations to this Court's electronic docket refer to the docket of adversary case number 10-04285 unless otherwise noted.

UBS AG is a Swiss public company with registered principal offices in Switzerland. (Am. Compl. ¶ 63).  It is the parent company of the global UBS bank.  (*Id.*).  UBS SA is a "Societas Europaea" incorporated in Germany.  (*Id.* ¶ 64).   UBS SA merged with and was absorbed into UBS Europe SE.  (*Id.*).  UBSFSL is a Luxembourg limited liability company incorporated as a *société anonyme*.  (*Id.* ¶ 65).  UBSTPM is a Luxembourg limited liability company incorporated as a *société anonyme*.  (*Id.* ¶ 66).  UBS SA, UBSFSL, and UBSTPM are all wholly owned subsidiaries of UBS AG.  (*Id.* ¶¶ 64–66).

The UBS Defendants are alleged to have deep involvement with Madoff and BLMIS. (Am. Compl. ¶ 69).  And to have worked with the Access Defendants[2] to create and grow Luxalpha's and Groupement Financier's investments in BLMIS.  (*Id.* ¶ 315).  The UBS Defendants, along with the Access Defendants, are alleged to have dominated and controlled the Feeder Funds, which they operated as a single enterprise.  (*Id.* ¶ 316).

Luxalpha and Groupement Financier were investment vehicles that fed into BLMIS. (Am. Compl. ¶ 16).  It is alleged that the Feeder Funds were created to invest in BLMIS with full knowledge of BLMIS' fraud.  (*Id.* ¶ 6) ("Defendants knew BLMIS was operating a fraud."); (*id.* ¶¶ 233, 352, 397).  The knowledge of BLMIS's fraud ultimately stems from a close friendship between Madoff and Littaye that dates back to 1985.  (*Id.* ¶¶ 1, 109).  Littaye and Thierry Magon de la Villehuchet ("Villehuchet") started an investment firm called Access International Advisors ("Access").  (*Id.* ¶ 2).  Access is comprised of a series of investment companies, including Access International Advisors, Inc., Access LLC, Access Ltd., AIA (Lux), and AP (Lux).  (*Id.*). The Feeder Funds were established by Access as two of several BLMIS feeder funds.  (*Id.* ¶¶ 2, 110).

---

[2] The "Access Defendants" are defined in the Complaint.  (Am. Compl. ¶ 2).

Prior to establishing the Feeder Funds, Littaye and Villehuchet had established several other BLMIS feeder funds through Access. (*Id.* ¶ 109). One of those funds was called Oreades SICAV ("Oreades"). (*Id.* ¶ 3). In order to operate as an "Undertakings for Collective Investments in Transferable Securities" ("UCITS") under Luxembourg law (*id.* ¶ 98), a fund needed to have "a promoter, or sponsor, playing a key role in the creation, launch, and management/administration of the fund." (*Id.* ¶ 166). The sponsor was required to be experienced and financially sound, and "would be liable to third parties for damages in the event faults, omissions, or deficiencies were committed in the management or administration of the fund." (*Id.* ¶ 166). Oreades opened BLMIS accounts in November 1997 and continued to operate as a BLMIS feeder fund until March of 2004, when its sponsor, BNP Paribas, determined that the relationship between Oreades and BLMIS was too risky to continue. (*Id.* ¶ 112–13).

BNP Paribas advised Access about several concerns that it had about BLMIS. (*Id.* ¶ 121). These included BLMIS' refusal to disclose its role as Oreades' asset manger to Luxembourg regulator, the Commission de Surveillance du Secteur Financier ("CSSF"); BLMIS' simultaneous roles as Oreades' custodian, broker-dealer, and investment adviser; the inexistence of a segregated Oreades's account at BLMIS; BLMIS' use of asynchronous faxed and mailed statements to deliver trading activity; and BLMIS' deliberate choice to evade United States and Luxembourg regulations and the scrutiny that accompanies such regulation. (*Id.* ¶ 113–22). BNP Paribas did not want to be liable to Oreades's investors. (*Id.* ¶ 122). Shortly after raising these concerns, Oreades was shut down and its BLMIS accounts closed. (*Id.* ¶ 121). BNP Paribas' exit from BLMIS investments was not the first time Access became aware of BLMIS' way of doing business. (*Id.* ¶ 278) ("In 2000 Access instructed that Madoff should not appear in any official document. In a 2004 document, Littaye wrote, '[w]e underline the

confidentiality of the product, and insist on the fact that [Madoff's] name must never be published.'") (cleaned up).  In order to continue operating as a BLMIS feeder fund, BNP Paribas needed to be replaced as the fund's sponsor.  (*Id.* ¶ 123).

**Luxalpha**

One week after Oreades' BLMIS accounts were closed, in March 2004, Luxalpha opened BLMIS accounts with UBS SA as its sponsor, despite Access and UBS SA allegedly having knowledge of BNP Paribas' concerns regarding BLMIS and other "warnings of fraud."  (Am. Compl. ¶¶ 125, 130, 159).  Internally at Access, the closing of Oreades and opening of Luxalpha was referred to as a "name change" and a "switch." (*Id.* ¶ 129).  Luxalpha was initially funded with withdrawals from Oreades.  (*Id.* ¶ 128).  "At least eleven of Oreades's investors withdrew approximately $330 million from Oreades and promptly reinvested those sums in Luxalpha." (*Id.* ¶ 128).  During the transition from Oreades to Luxalpha, a UBS AG employee "expressed deep reservations" about BLMIS.  (*Id.* ¶ 131) ("We normally have to give 'NO' as the answer in cases like Madoff.") (cleaned up).  Despite this, UBS decided that the income it could generate through BLMIS outweighed the risk of fraud.  (*Id.* ¶¶ 132–33).

BLMIS' fee structure was not customary in the industry and was structured in order to entice hedge fund managers and entities like Access and UBS to invest in BLMIS.  Instead of charging the customary investment advisory fee of "1% to 2% of assets under management plus a performance fee of 10% to 20% of profits earned by the investment," BLMIS charged "$1 per option contract and $0.04 per equity share traded." (*Id.* ¶ 274).  This left "hundreds of millions, if not billions, of dollars on the table" that could be collected by hedge funds as management fees. (*Id.*)  The Trustee has alleged that the generation of such fees was one of the primary purposes that the Access Defendants and the UBS Defendants operated the Feeder Funds.  (*Id.* ¶

91) ("AIA Ltd. is escribed in Access's internal documents as an offshore 'money box' set up for

the 'prime purpose [of] … the receipt of fees' on behalf of Access."); (*id.* ¶ 111) ("Littaye's and

Madoff's relationship also allowed Access to obtain fees derived from BLMIS investments,

through which Littaye and Villehuchet enriched themselves."); (*id.* ¶ 204) ("The net effect of the

operating procedures put in place for Luxalpha was to allow UBS SA and UBSFSL, two

sophisticated financial institutions that appeared to the public to be directly involved in the

operation of Luxalpha, to earn fees for serving in roles that actually provided no real oversight or

protection for Luxalpha's assets . . . ."). The clawback of these fees is at the heart of this lawsuit.

(*Id.* ¶ 333).

According to the Complaint, Access used UBS as a "front" or "window dressing" to give

the appearance of compliance with Luxembourg law and "to deflect regulatory scrutiny by

interposing a large, reputable, international bank between Luxalpha and BLMIS." (*Id.* ¶¶ 169–

71. None of the issues raised by BNP Paribas were corrected before Luxalpha began investing in

BLMIS. (*Id.* ¶ 4). In exchange for allowing Access to use its reputation in this way, additional

protections were put in place "to shield UBS from potential liability." (*Id.* ¶ 4). Littaye and

Villehuchet allegedly used a network of Access-related entities and shell corporations to service

BLMIS feeder funds, including Luxalpha. (*Id.* ¶ 77). One such shell entity, Access International

Advisors (Luxembourg) S.A.[3] ("AIA (Lux)"), that nominally served as Luxalpha's portfolio

manager and portfolio advisor (*id.* ¶ 93), entered into a series of indemnity agreements with UBS

SA and Luxalpha's directors (who were also UBS SA employees). (*Id.* ¶ 158). The indemnity

agreements "purported to indemnify and hold harmless the directors and UBS SA for any

---

[3] AIA (Lux) eventually became Access Management Luxembourg S.A. ("AML"). (Am. Compl. ¶ 92). "Upon AML's appointment as Luxalpha's manager in November 2008, it entered into substantially similar indemnity agreements with UBS SA and the Luxalpha directors. Through these indemnity agreements, the UBS Defendants continued to limit the liability to which Luxalpha exposed them." (Am. Compl. ¶ 161).

liabilities resulting from their involvement with Luxalpha." (*Id.*). The parties to the agreement acknowledged and agreed that UBS SA would "act as a figure head to third parties in the sponsorship and in the management[]" of Luxalpha. (*Id.* ¶ 159). And that AIA Lux would assume UBS SA's liability for "damages resulting from proved irregularities, inadequacies, or omissions in the administration or management" of Luxalpha." (*Id.*). In addition to the indemnity agreements, UBS SA "demanded that Access provide a 'hold harmless' letter from Luxalpha's investors for loss resulting from BLMIS's failure" and "required Access to obtain and pay for an insurance policy covering Luxalpha's risks." (*Id.* ¶ 160).

Luxalpha's board of directors consisted of senior UBS and Access personnel, and its service providers were UBS and Access entities. (*Id.* ¶ 134). Even though UBS SA formally served as Luxalpha's custodian, UBS SA "entered into a separate agreement with BLMIS that explicitly designated BLMIS as the sub-custodian of Luxalpha's assets, unbeknownst to Luxalpha's investors and the Luxembourg regulators." (*Id.* ¶ 126).

**Groupement Financier**

Access established Groupement Financier as a BLMIS feeder fund in February 2003. (Am. Compl. ¶ 135). Groupement Financier is a British Virgin Islands ("BVI") investment fund that invested 100% of its assets directly with BLMIS. (*Id.* ¶ 104).

In 2005, UBS serviced Groupement Financier and, it is alleged that the UBS and Access Defendants operated both Luxalpha and Groupement Financier. (*Id.* ¶ 6). The BLMIS Feeder Funds shared information, officers, and directors. (*Id.*) UBS SA was Groupement Financier's "prime bank," or sponsor, and in this role "was responsible for the receipt of the fund's subscription monies and the subsequent transfer of those monies to the Bank of Bermuda, which acted as Groupement Financier's beneficiary bank." (*Id.* ¶ 72). "UBS SA was also responsible

for maintaining a mirror book-keeping of all transactions reported by BLMIS so as to enable

UBSFSL, the fund's administrator, to calculate the fund's net asset value ('NAV')." *Id.*  AIA

(Lux) and AP (Lux) served nominally as Groupement Financier's investment adviser.  (*Id.* ¶

138).  In reality, this role was allocated to BLMIS.  (*Id.* ¶ 138).

**Trustee's Complaint**

In his Complaint, the Trustee asserts eight counts.  (Am. Compl. ¶ 348–99).  Counts one

and eight are asserted only against Luxalpha.  (*Id.* ¶¶ 355, 399).  Counts two, three, four, five,

and six are asserted only against the Feeder Funds.  (*Id.* ¶¶ 356–88). Count seven is asserted

against all of the other Defendants—referred to as the "Subsequent Transferee Defendants."

(Am. Compl. ¶ 332); (*id.* ¶¶ 332–40) (explaining the subsequent transfers to each Subsequent

Transferee in detail); (*id.* ¶¶ 389–92).  In count seven, the Trustee is seeking to recover

subsequent transfers of BLMIS customer property that was initially transferred from BLMIS to

the Feeder Funds and then subsequently transferred from the Feeder Funds to the Subsequent

Transferee Defendants.  (*Id.* ¶¶ 332–40).

**Initial Transfers**

According to the Complaint, "[t]he Feeder Fund Defendants collectively invested

approximately $2 billion with BLMIS through more than 150 separate transfers via check and

wire directly into the [JPMorgan Chase in New York, Account No. xxxxxxxxxxx1703 (the "703

Account")]." (Am. Compl. ¶ 326).  The Trustee is seeking to avoid at least $1.1 billion in

transfers paid from BLMIS to the Feeder Funds within six years of the filing date of this SIPA

case (the "Six Year Transfers").  (*Id.* ¶ 327).  Of the Six Year Transfers, $1.01 billion was

transferred from BLMIS to the Feeder Funds during the two years preceding the filing of this

SIPA case ("the Two Year Transfers").  (*Id.* ¶ 328).  "The Two Year Transfers included transfers

of approximately $735 million to Luxalpha and approximately $275 million to Groupement

Financier." (*Id.*).

## Subsequent Transfers

> In the Complaint, the Trustee asserts that
>
> UBS SA received at least $32.8 million in fees from Luxalpha for serving as the
> official custodian and official manager of Luxalpha from February2004 to August
> 2006, and an additional $6.6 million in fees from Luxalpha for serving as the
> official custodian of Luxalpha from August 2006 to December 2008. UBS SA
> also received at least $1 million in fees from Groupement Financier for serving as
> the official prime bank of Groupement Financier from 2005 to December 2008,
> and at least $500,000 in fees from Groupement Levered for serving as the official
> custodian of Groupement Levered from 2005 to December 2008.
> ***
> UBSFSL received at least $2.5 million in fees from Luxalpha for serving as the
> official administrator of Luxalpha from February 2004 to December 2008.
> UBSFSL also received at least $497,000 from Groupement Financier for serving
> as the official administrator of Groupement and Groupement Levered from 2005
> to December 2008.
> ***
> UBSTPM received at least $53.3 million in fees from Luxalpha for serving as the
> official manager of Luxalpha from August 2006 to November 2008.

(Am. Compl. ¶ 333).

> On April 22, 2022, the UBS Defendants filed a motion to dismiss the Trustee's complaint

against them.  In the motion to dismiss, the UBS Defendants argue that: seek dismissal for lack

of personal jurisdiction; for failure to plead actual intent to defraud on the part of BLMIS; and

for failure to allege that they received BLMIS customer property, and they assert the affirmative

defenses of the "safe harbor" and "good faith."  *See* Mem. L., ECF No. 286.  The Trustee has

opposed the motion.  The Court heard oral argument on these issues on September 14, 2022.

(Sept. 14. 2022 Hr'g Tr., ECF No. 326).

<u>**Discussion**</u>

## Personal Jurisdiction

UBS AG, UBSFSL, and UBSTPM (the "PJ Defendants") seek dismissal for lack of personal jurisdiction.[4]  The Trustee argues that there is specific jurisdiction over them.

In the Complaint, the Trustee argues that the PJ Defendants maintained minimum contacts with New York in connection with the claims in this adversary proceeding.  (Am. Compl. ¶ 22).  To survive a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the Trustee "must make a prima facie showing that jurisdiction exists."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)).  A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).  "'It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).); *see also Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 187 (Bankr. S.D.N.Y. 2018) (same).

"Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fin.*, 722 F.3d at 84–85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)); *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 (Bankr. S.D.N.Y. 2021) (same).  At the pre-discovery stage, the allegations need not be factually supported.  *See Dorchester Fin. Securities Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d. Cir. 2013) (explaining that an averment of facts is necessary only after discovery).

---

[4] Pursuant to stipulation so-ordered by the Court on June 18, 2013, UBS Lux agreed not to contest personal jurisdiction in this action.  *See* So Or'd Stip., ECF No. 154.

In order to be subjected to personal jurisdiction in the United States, due process requires that a defendant have sufficient minimum contacts with the forum in which defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501 (Bankr. S.D.N.Y. 2012), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  The pleadings and affidavits are to be construed "'in the light most favorable to the plaintiffs, resolving all doubts in their favor.'" *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 187 (Bankr. S.D.N.Y. 2018).

> The Supreme Court has set out three conditions for the exercise of specific jurisdiction over a nonresident defendant.  First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State.  Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct.  Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up).

**Purposeful Availment**

"[M]inimum contacts . . . exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018).  "Although a defendant's contacts with the forum state may be intertwined with its transactions or interactions with the plaintiff or other parties, a defendant's relationship with a third party, standing alone, is an insufficient basis for jurisdiction."  *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up).  "It is insufficient to rely on a defendant's random, fortuitous, or

attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific

jurisdiction." *Id.*

> Under the federal law governing the exercise of in personam jurisdiction, if a
> corporation is the alter ego of an individual defendant, or one corporation the alter
> ego of another, the Court may pierce the corporate veil jurisdictionally and
> attribute contacts accordingly.  It is well established that the exercise of personal
> jurisdiction over an alter ego corporation does not offend due process.

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127, 141 (Bankr. S.D.N.Y. 2016).

> Federal common law allows piercing of the corporate veil where (1) a corporation
> uses its alter-ego status to perpetrate a fraud or (2) where it so dominates and
> disregards its alter-ego's corporate form that the alter-ego was actually carrying
> on the controlling corporation's business instead of its own.

> With respect to the second prong, a plaintiff demonstrates that an entity is the
> alter ego of another entity for jurisdictional purposes when one entity exerts
> greater than normal control over the other or one entity is merely an empty shell.
> A plaintiff need not show that the allegedly sham corporate structure laid out in a
> complaint was used for an evil purpose, but must demonstrate that it would be
> unfair under the circumstances not to disregard the corporate form.

> While traditionally alter ego jurisdiction is used to obtain personal jurisdiction
> over a foreign parent that exercises control over affiliated entities within the
> forum, the reverse is also possible, and a parent's contacts with a forum can be
> imputed to a subsidiary to obtain personal jurisdiction over that subsidiary.
> Federal courts have also found that an individual shareholder's contacts can be
> imputed to an alter ego corporation.

*Id.* at 141–42 (internal citations and quotations omitted).

> The Trustee alleges that

> [e]ach [UBS] defendant has maintained minimum contacts with New York in
> connection with the claims in this adversary proceeding.  As further alleged
> herein, the Defendants have or had offices in New York, are doing or did business
> in New York, and/or transact or transacted business in New York during the time
> periods addressed herein. . . . The UBS Defendants . . .  delivered agreements or
> caused agreements to be delivered in New York, relating to BLMIS. In addition,
> certain of the UBS Defendants . . . communicated regularly with persons in New
> York regarding the Feeder Fund Defendants and/or BLMIS, and also sent and/or
> received funds to and/or from BLMIS in New York, utilizing New York banks.

(Am. Compl. ¶ 22).  To the extent that the Trustee can establish that the PJ Defendants

are alter egos of UBS SA, UBS SA's contacts can be imputed to them.  *Weisfelner v.*

*Blavatnik* (*In re Lyondell Chem. Co.*), 543 B.R. 127, 141 (Bankr. S.D.N.Y. 2016).   As

UBS SA has already stipulated to this Court's exercise of personal jurisdiction over it (So

Or'd Stip., ECF No. 154), this Court need not consider whether it has purposefully

availed itself of this forum.[5]

Specific jurisdiction may also exist where an out-of-forum defendant purposefully

directed the wrongful conduct at the forum.  This theory of personal jurisdiction is typically

invoked

> where the conduct that forms the basis for the controversy occurs entirely out-of-
> forum, and the only relevant jurisdictional contacts with the forum are therefore
> in-forum effects harmful to the plaintiff.  In such circumstances, the exercise of
> personal jurisdiction may be constitutionally permissible if the defendant
> expressly aimed its conduct at the forum.

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 CIV. 5263 (AKH), 2017

WL 3600425, at *7 (S.D.N.Y. Aug. 18, 2017) (quoting *Licci ex rel. Licci v. Lebanese Canadian*

*Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013)); *see also In re Terrorist Attacks on Sept. 11, 2001*,

714 F.3d 659, 674 (2d Cir. 2013) (allegations that defendants "purposefully directed . . .

activities at residents of the forum" is a sufficient basis for personal jurisdiction) (quoting *Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985)).  The PJ Defendants argue that the

Trustee has not alleged that they have sufficient contacts with the United States.  The Complaint

suggests otherwise.

The Trustee has alleged that "[t]he UBS Defendants' deep involvement with Madoff and

the BLMIS-feeder funds was far-reaching, extended well beyond Luxalpha and Groupement

---

[5] However, if the Court did analyze UBS SA's contacts with this forum, the Court would likely find purposeful
availment due to UBS SA's opening of accounts at BLMIS, among other things.  (Am. Compl. ¶¶ 125–27).

Financier, and involved billions of dollars being funneled into BLMIS." (*Id.* ¶ 69).  The UBS

Defendants

> presented themselves to the public as a unified global entity operating as "a
> coherent and effective whole." UBS shared a centralized structure for core
> enterprise functions including finance, risk, legal, compliance, and shared services
> such as human resources, information technology, communication and branding,
> and corporate development. Upon information and belief, this organizational
> structure is designed to ensure UBS AG's centralized control of global business
> strategy and reporting obligations for UBS group companies.

(*Id.* ¶ 67).  The UBS Defendants worked together to open Luxalpha as a feeder fund to BLMIS

despite "persistent warning of fraud at BLMIS."  (*Id.* ¶ 130; *see also id.* ¶¶ 140–155).  They

allegedly ignore these warnings of fraud because the profits UBS could make outweighed the

risks.  (*Id.* ¶ 133).  UBS SA held the BLMIS Account in the name of "UBS (Luxenbourg) S.A.

for the benefit of Luxalpha."  (*Id.* ¶ 127).   Senior UBS personnel served on Luxalpha's board of

directors and UBS entities served as service providers to Luxalpha.  (*Id.* ¶ 134).  UBS also served

as Groupement Financier's official prime bank and Groupement Levered's official custodian.

(*Id.* ¶ 136).  UBS allegedly "concealed Madoff's involvement with Luxalpha from the

Luxembourg regulator, the Commission de Surveillance du Secteur Financier (the 'CSSF'),

knowingly omitting any reference to Madoff or BLMIS when identifying Luxalpha's custodians

and managers to the CSSF."  (*Id.* ¶ 12).  "The Access Defendants and the UBS Defendants

worked together to extend Madoff's fraud to European investors, enriching themselves through

the receipt of millions of dollars' worth of fees that—unlike their clients' funds—were not

subject to the obvious fraud risk that Defendants knew Madoff posed."  (*Id.* ¶ 15).

     To prevent whatever liability might come from associating with BLMIS' fraud, the UBS

Defendants "sought to protect themselves through a series of indemnity agreements with the

Access Defendants."  (*Id.* ¶ 156).

**UBS AG**

UBS AG is a Swiss public company with registered and principal offices in Switzerland. (Am. Compl. ¶ 63). The Trustee alleges that it conducts daily business activities in Stamford, Connecticut and is present in New York with offices at 299 Park Avenue, New York, N.Y. and 1285 Avenue of the Americas, New York, N.Y. (*Id.*). All of the redemptions made by Luxalpha were processed though an account held at UBS AG's Stamford, Connecticut branch. (*Id.* ¶ 70).

UBS AG is alleged to have investigated Madoff and BLMIS and uncovered "concerns about the total assets BLMIS was managing and whether there was a point at which these assets would be large enough to deteriorate the strategy's performance." (Am. Compl. ¶ 153). Madoff also refused a face-to-face meeting with UBS AG's analyst. (*Id.* ¶ 154). He was allegedly identified as a "fraud risk." (*Id.* ¶ 159; *see also id.* ¶ 131 (UBS AG employee stating: "We normally have to give 'NO' as the answer in cases like Madoff,"). Additionally, UBS AG is alleged to have known that by investing in BLMIS, Luxalpha was violation Luxembourg law. (*Id.* ¶ 197). Despite these concerns, UBS SA served as Luxalpha's sponsor and promoter (*id.* ¶ 168), approved false reports for Luxalphas's auditors (*id.* ¶ 265), and accepted funds from BLMIS on behalf of Luxalpha (*id.* ¶ 294).

Interestingly, the Trustee alleges that UBS AG received a $4,000,000 wire from BLMIS, on behalf of Luxalpha, even though the balance in Luxalpha's BLMIS account was only $0.47—resulting in a negative balance to BLMIS of $3,952,257.79. (*Id.* ¶ 294). The Trustee alleges that "Luxalpha and Groupement Financier did not have margin accounts with BLMIS and BLMIS never charged Luxalpha or Groupement Financier any interest for its margin trades, effectively providing millions of dollars of interest-free loans. No legitimate institution would

have advanced the funds millions of dollars at zero percent interest." (*Id.* ¶ 295).

"In 2004 and 2005, Luxalpha also falsely reported in Risk Approach Memos prepared for Luxalpha's auditors that BLMIS's option counterparties were approved by UBS AG as Luxalpha's promoter. No such counterparties were ever identified to, or approved by, UBS AG. Of course, no such counterparties ever existed." (*Id.* ¶ 265).

**UBSFSL**

Luxalpha's registered office was at 33a, Avenue John F. Kennedy, L-1855 Luxembourg, which is the same address as UBSFSL. (*Id.* ¶¶ 65, 98). "Without any independent verification, UBSFSL was creating meaningless accounting records that just repeated the trade confirmations and account statements that it received from BLMIS. UBSFSL thereby facilitated the concealment of BLMIS's true involvement and perpetuated the fraud." (*Id.* ¶ 201). UBSFSL also intentionally "avoided any avoided any direct legal or contractual links to BLMIS and Madoff." (*Id.* ¶ 137) ("**UBSFSL should ever enter into a direct contact with Bernard Madoff!!!**") (emphasis in original).

"The net effect of the operating procedures put in place for Luxalpha was to allow UBS SA and UBSFSL, two sophisticated financial institutions that appeared to the public to be directly involved in the operation of Luxalpha, to earn fees for serving in roles that actually provided no real oversight or protection for Luxalpha's assets, and which provided BLMIS with the freedom to manipulate reports as needed to perpetuate the Ponzi scheme." (*Id.* ¶ 204).

UBSFSL also "served as Groupement Financier's and Groupement Levered's official administrator and was responsible for accounting functions, keeping the register of shareholders, handling subscriptions and redemptions, communications with investors, and preparations of

financial statements for the funds. It also calculated the funds' respective NAV." (*Id.* ¶ 136). "The NAV for Groupement Financier was calculated by UBSFSL based on unverified and unconfirmed trade confirmations that BLMIS provided to UBS SA." (*Id.* ¶ 209).

**UBSTPM**

"UBSTPM replaced UBS SA as Luxalpha's nominal portfolio manager from August 2006 to November 2008. UBSTPM represented to the CSSF that it managed, administered, and monitored the fund's investment policies and restrictions." (*Id.* ¶ 205). Luxalpha's registered office was at 33a, Avenue John F. Kennedy, L-1855 Luxembourg, which is the same address as UBSTPM. (*Id.* ¶¶ 66, 98). "When UBSTPM became Luxalpha's management company, UBS continued to conceal the delegation of the fund's management to BLMIS." (*Id.* ¶ 206). "UBS created the façade that Luxalpha's custodial and managerial duties were divided between two Luxembourg companies, UBS SA and UBSTPM, when in fact, from the first day of Luxalpha's operation, both roles rested solely with BLMIS in New York." (*Id.* ¶ 281).

These allegations are legally sufficient to constitute a prima facie showing of jurisdiction. *Dorchester Fin. Securities Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d. Cir. 2013). "[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State— either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). The UBS Defendants are alleged to have directed their wrongful conduct into New York by assisting the Feeder Funds, Access and BLMIS in continuing the fraud in order to profit from their participation in the scheme. The UBS Defendants "intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom." *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 506 (Bankr. S.D.N.Y. 2012).

Defendants' alleged contacts with the United States and New York are not random, isolated, or fortuitous.

**Arise out of or relate to the defendant's forum conduct**

As to the second prong, the suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, __ U.S. __, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, the court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Here, the Trustee is asserting subsequent transfer claims against PJ Defendants for monies they received from the BLMIS Feeder Funds. (Am. Compl. ¶¶ 54–58). These allegations are directly related to their management, custodial, and administrator duties and activities with BLMIS through Access and the Feeder Funds. *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) (finding that the redemption and other payments the defendants received as direct investors in a BLMIS feeder fund were the proximate cause of the injuries that the Trustee sought to redress and arose from the New York contacts such as sending subscription agreements to New York, wiring funds in U.S. dollars to New

York, sending redemption requests to New York, and receiving redemption payments from a

Bank of New York account in New York).

The suit is affiliated with the alleged in-state conduct. *Goodyear Dunlop Tires*

*Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

**Reasonableness**

Having found sufficient minimum contacts, the Court must determine if exercising

personal jurisdiction over the Defendants is reasonable and "comport[s] with fair play and

substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal

quotations omitted). Factors the Court may consider include the burden on the defendants, the

forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient

and effective relief, the interstate judicial system's interest in obtaining the most efficient

resolution of controversies, and the shared interest of the several States in furthering fundamental

substantive social policies. *Id.* at 477.

The exercise of jurisdiction is reasonable. Defendants are not burdened by this litigation.

Defendants actively participated in this Court's litigation for over twelve years. They are

represented by U.S. counsel and have continually associated with the New York based Access

Defendants and BLMIS. The forum and the Trustee both have a strong interest in litigating

BLMIS adversary proceedings in this Court. *Picard v. Maxam Absolute Return Fund, L.P. (In re*

*BLMIS)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012); *Picard*

*v. Chais (In re BLMIS)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010); *Picard v. Cohmad Sec.*

*Corp. (In re BLMIS)*, 418 B.R. 75, 82 (Bankr. S.D.N.Y. 2009); *Picard v. Fairfield Greenwich*

*Grp., (In re Fairfield Sentry Ltd.*), 627 B.R. 546, 568 (Bankr. S.D.N.Y. 2021); *see also In re*

*Picard*, 917 F.3d 85, 103 (2d Cir. 2019) ("The United States has a compelling interest in allowing domestic estates to recover fraudulently transferred property.").

By alleging that PJ Defendants intentionally targeted their activities at BLMIS, the Trustee has met his burden of alleging jurisdiction as to each subsequent transfer that originated with BLMIS.  As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going."  *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019).  Here, the UBS Defendants did more than simply "buy into" feeder funds.  They "intentionally misled both U.S. and Luxembourg regulators concerning BLMIS's roles, responsibilities, and options trading partners" and "worked together to extend Madoff's fraud to European investors, enriching themselves through the receipt of millions of dollars' worth of fees."  (Am. Compl. ¶¶  12, 15).  The Trustee has made a prima facie showing of personal jurisdiction.

**12(b)(6) standard**

"To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  The claim is facially plausible when a plaintiff pleads facts that allow the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.").  In deciding

a motion to dismiss, the Court should assume the factual allegations are true and determine

whether, when read together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S.

at 679.  "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge

that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."

*Twombly*, 550 U.S. at 556.

   In deciding the motion, "courts must consider the complaint in its entirety, as well as

other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in

particular, documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2007).  A complaint is "deemed to include any written instrument attached to it as an exhibit[,] .

. . documents incorporated in it by reference[,]" and other documents "integral" to the complaint.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted).  A

document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous

information and relied on it in framing the complaint.  *DeLuca v. AccessIT Grp., Inc.*, 695 F.

Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153).

   While the Trustee must allege that the initial transfer from BLMIS to Feeder Fund

Defendants are avoidable, he is not required to avoid the transfers received by the initial

transferees before asserting an action against subsequent transferees.  *IBT Int'l Inc. v. Northern*

*(In re Int'l Admin Servs., Inc.)*, 408 F.3d 689, 706-07 (11th Cir. 2005).  The Trustee is free to

pursue any of the immediate or mediate transferees, and nothing in the statute requires a different

result. *IBT Int'l, Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 706–07 (11th

Cir. 2005).

**The Safe Harbor does not bar the avoidance of the Initial Transfers to the Feeder Funds**

The UBS Defendants have raised the "safe harbor" defense, found in § 546(e), to the Trustee's allegations. Section 546(e) is referred to as the safe harbor because it protects a transfer that is a "settlement payment ... made by or to (or for the benefit of) a ... financial institution [or] financial participant," or that is "made by or to (or for the benefit of) a ... financial institution [or] financial participant ... in connection with a securities contract." 11 U.S.C. § 546(e). By its terms, the safe harbor is a defense to the avoidance of the Initial Transfers—those transfers from BLMIS to the Feeder Fund Defendants. *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018). The Subsequent Transferee Defendants are also entitled to raise a § 546(e) defense against Trustee's recovery of the initial transfer funds. *Picard v. Fairfield Inv. Fund (In re BLMIS)*, No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021). To the extent that the safe harbor bars the Trustee from collecting the initial transfer, he would also be barred from collecting any subsequent transfers.

In *Fishman*, the Court of Appeals for the Second Circuit determined that, in many of the Trustee's avoidance actions, § 546(e) applied because BLMIS' transfers to its customers qualified as payments made "in connection with" securities contracts between BLMIS and its customers. *See Picard v. Ida Fishman Recoverable Trust (In re BLMIS)*, 773 F.3d 411, 422 (2d Cir. 2014). However, the safe harbor does not apply, by its plain terms, to transfers where the transferee is complicit in BLMIS' fraud. *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022). This is because "any transferee who knew the transfers it received from Madoff Securities contained only stolen

proceeds also knew those transfers were neither settlement payments [n]or transfers in

connection with a security agreement" and therefore, § 546(e) cannot apply.[6]  *Id.*

> The safe harbor was intended, among other things, to promote the reasonable
> expectations of legitimate investors.  If an investor knew that BLMIS was not
> actually trading securities, he had no reasonable expectation that he was signing a
> contract with BLMIS for the purpose of trading securities for his account.  In that
> event, the Trustee can avoid and recover preferences and actual and constructive
> fraudulent transfers to the full extent permitted under state and federal law.

*Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 28 (Bankr. S.D.N.Y. 2016)

(internal citations omitted), *vacated and remanded on other grounds, Picard v. Citibank, N.A.* (*In*

*re BLMIS*), 12 F.4th 171 (2d Cir. 2021)). By holding that the affirmative defense provided by §

546(e) is not applicable in situations such as the one alleged here, "sham" securities contracts do

not prevent the Trustee from clawing back complicit parties' ill-gotten gains.  The district court

has already determined that "those defendants who claim the protections of Section 546(e)

through a Madoff Securities account agreement but who actually knew that Madoff Securities

was a Ponzi scheme are not entitled to the protections of the Section 546(e) safe harbor, and their

motions to dismiss the Trustee's claims on this ground must be denied."  *Cohmad*, No. 12 MC

115(JSR), 2013 WL 1609154, at *10 (S.D.N.Y. Apr. 15, 2013); *see also Picard v. Multi-Strategy*

*Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3,

2022) ("[I]n circumstances in which a transferee was complicit in Madoff Securities' fraud,

Section 546(e) d[oes] not apply as a matter of its express terms.").

This Court is powerless to reconsider this issue, agrees with the district court's reasoning,

and finds the district court's holding consistent with *dicta* set forth by the Court of Appeals for

---

[6] While this is sometimes referred to as the "knowledge exception" to the safe harbor, "*Cohmad* did not carve out
any atextual but equitable exception to an otherwise applicable Section 546(e) defense; rather, it simply concluded
that, in circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) did not apply
as a matter of its express terms."  *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No. 22-CV-06502 (JSR), 2022
WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

the Second Circuit. *See Picard v. Ida Fishman Revocable Trust* (*In re Bernard L. Madoff Inv. Sec. LLC*), 773 F.3d 411, 420 (2d Cir. 2014) ("The clawback defendants, having every reason to believe that BLMIS was actually engaged in the business of effecting securities transactions, have every right to avail themselves of all the protections afforded to the clients of stockbrokers, including the protection offered by § 546(e).").

Whether the safe harbor applies to the initial transfers under the theory that BLMIS' transfers to the Feeder Funds were made in connection with the Feeder Fund's contracts with its customers (rather than the Feeder Funds' contracts with BLMIS) is not answerable on the pleadings. If such a fact-specific determination is needed, the Court will make it with the benefit of a "full factual record." *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *9 (S.D.N.Y. Nov. 3, 2022).

**The Feeder Fund Defendants' Had Actual Knowledge that BLMIS was Not Trading Securities**

Here the Trustee has pleaded sufficient allegations of the Feeder Fund Defendants' actual knowledge that no securities were being traded. (Am. Compl. ¶ 329). These allegations that the Feeder Fund Defendants were complicit in BLMIS's fraud, prevents the Court from dismissing the case on account of the Access Defendants' affirmative § 546(e) defense. The Trustee has alleged that Luxalpha was aware of BLMIS's impossible trading activity and performance. (*Id.* ¶ 13).

The Feeder Funds are not natural persons and, as such, act only through "the instrumentality of their officers or other duly authorized agents." *45 John Lofts, LLC v. Meridian Capital Grp., LLC* (*In re 45 John Lofts, LLC*), 599 B.R. 730, 743 (Bankr. S.D.N.Y. 2019). An agent's knowledge and acts are imputed to a corporate defendant. *Id.*; (Am. Compl. ¶¶ 315–323) (alleging imputation of knowledge). UBS, Littaye, Villehuchet, and all of the Access

Defendants are agents or officers of Luxalpha whose knowledge can be imputed to Luxalpha. (Am. Compl. ¶ 125) (UBS SA was Luxalpha's agent); (*id.* ¶ 180) ("UBS SA was, by law, responsible for both the safekeeping and the supervision of [Luxalpha]'s assets."); (*id.* ¶ 101) (Littaye was a director of Luxalpha); (*id.* ¶ 102) (Delandmeter was a director of Luxalpha); (*id.* ¶ 322) ("Access Defendants and UBS Defendants were Luxalpha's and Groupement Financier's agents, and their conduct and/or direct knowledge of fraud at BLMIS is imputed to these two funds.").  Similarly, Littaye, Villehuchet, Delandmeter, and all of the UBS and Access Defendants are agents or officers of Groupement Financier.  (*Id.* ¶ 106) (Littaye and Villehuchet were directors of Groupement Financier); (*id.* ¶ 107) (Delandmeter was a Legal Adviser to Groupement Financier); (*id.* ¶ 323) ("The Access Defendants and UBS Defendants were Luxalpha's and Groupement Financier's agents, and their conduct and/or direct knowledge of fraud at BLMIS is imputed to these two funds.").   Their knowledge of BLMIS' fraud can be imputed to Groupement Financier.

In the Complaint, the Trustee has alleged that UBS SA knew Madoff's returns were "impossible" prior to the formation of Luxalpha.  (*Id.* ¶¶ 143, 147).  UBS SA assisted Madoff in evading applicable laws and regulations.  (*Id.* ¶ 180).  UBS SA knew that they had no way of verifying whether BLMIS was making trades.  (*Id.* ¶¶ 208–09).  UBS SA removed all references to Madoff from UBS audit reports.  (*Id.* ¶ 280).  UBS knew it was operating as a "front" for Luxalpha. (*Id.* ¶ 169).  It routinely lied to protect Luxalpha and BLMIS.  (*Id.* ¶¶ 147–52).  A UBS subsidiary concluded that Madoff was engaging in fraud.  (*Id.* ¶ 148).

Littaye was friends with Madoff and the only person who could contact Madoff directly regarding BLMIS investments.  (*Id.* ¶¶ 1, 178).  "Littaye actively impeded any inquiry into . . . signs of fraud by quashing or deflecting questions and by purposely omitting the names 'BLMIS'

and 'Madoff' from prospectuses and regulatory filings." (*Id.* ¶ 11). Littaye knowingly assisted

BLMIS in evading the SEC. (*Id.* ¶ 97). He prevented Access from doing due diligence on

BLMIS. (*Id.* ¶ 179). Littaye knew that BNP Paribas suspected that BLMIS did not segregate

funds, could not determine where BLMIS customer funds were held, and was unable to verify

any trades were taking place. (*Id.* ¶ 115). Littaye knew Madoff was using a disreputable

accounting form and quashed any inquiry into it. (*Id.* ¶ 283). He insisted that Madoff's name

never be published. (*Id.* ¶ 278–79).

In 2006, Theodore Dumbald ("Dumbauld"), an Access Defendant and a Partner at AIA

LLC and its Chief Investment Officer, investigated Madoff on Villehuchet's request. (*Id.* ¶ 220–

21). He concluded that Madoff's was not trading options as he claimed. (*Id.* ¶¶ 221-22)

("Dumbauld confirmed that the trades being reported by BLMIS did not show up anywhere in

the O[ptions] C[learing] C[orporation] database."). Based on this, Access hired a third-party

consultant, Chris Culter, and within four days, Cutler discovered evidence of BLMIS' fraud. (*Id.*

¶¶ 224–25). Culter found that BLMIS was not trading on the Options Clearing Corporation

database and that the volume of BLMIS' purported options trades exceeded[7] the volume of all of

the options trades on CBOE.[8] (*Id.* ¶226). Cutler could not identify any counterparties to

BLMIS' trades. (*Id.* ¶ 257). Cutler advised the Access Defendants that, based on his

investigation, it appeared that Madoff did not understand his own strategy. (*Id.* ¶ 235). Cutler's

review matched Access' own 1999 investigation that showed BLMIS providing Oreades' with

"no negative months and very stable positive performance"—the classic hallmarks of a Ponzi

---

[7] "There were 473 instances over the lifetime of Luxalpha and Groupement Financier where BLMIS's purported trading for Luxalpha and Groupement Financier exceeded the total CBOE volume. In 362 of these instances, the volume traded was at least twice the CBOE; in 151 instances, the volume traded was at least ten times the volume traded on the CBOE." (Am. Compl. ¶ 231). "The statements and trade confirmations revealed that in 52% of the instances when Madoff purported to trade options for Luxalpha, or Groupement Financier, he purported to trade more than 100% of such options that were traded on the entire CBOE on that day." (*Id.* ¶ 232).
[8] The CBOE is the Chicago Board Options Exchange. The exchange listed on the trade confirmations sent by BLMIS. (Am. Compl. ¶ 305).

scheme.  (*Id.* ¶ 245); (*id.* ¶ 242) (including AIA, LLC's chart comparing Luxalpha's returns

against the S&P 500 with the distinctive performance curve of every Ponzi scheme—a straight

line).  Cutler also concluded that if Madoff were really executing trades, he would move the

market.  (*Id.* ¶ 249).  Even Access' clients knew that trading at such volumes was impossible.

(*Id.* ¶ 253).  Cutler presented evidence of BLMIS' fraud to Access, Littaye, Villehuchet, and

Dumbauld and advised Access to exit BLMIS; the Access Defendants suppressed his findings.

(*Id.* ¶¶ 219, 267).

Here, the Trustee has sufficiently plead the Feeder Funds (and most of the subsequent

transferees[9]) had actual knowledge that BLMIS was not trading securities, which makes the safe

harbor inapplicable by its express terms. *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No.

22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

**Whether BLMIS's Initial Transfers Are Avoidable as Intentionally Fraudulent
Conveyances?**

In relevant part, § 548(a)(1)(A) allows the Trustee to avoid any transfer made within two

years before the filing date of this SIPA action, if BLMIS made the transfer with "actual intent to

hinder, delay, or defraud."  11 U.S.C. § 548(a)(1)(A).  The Access Defendants argue that

BLMIS' initial transfers to the Feeder Fund Defendants, made within two years of the SIPA

filing date, are not avoidable because the Trustee has failed to plead BLMIS' actual fraudulent

intent with respect to each transfer and that the Ponzi scheme presumption cannot be used to

plead BLMIS' actual fraudulent intent.

---

[9] Where § 546(e) does not "embrace the initial transfer, the subjective knowledge of a subsequent transferee cannot
retroactively render it applicable."  *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR),
2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

> Where the actual fraudulent transfer claim is asserted by a bankruptcy trustee, applicable Second Circuit precedent instructs courts to adopt a more liberal view since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge. Moreover, in a case such as this one, where the Trustee's lack of personal knowledge is compounded with complicated issues and transactions that extend over lengthy periods of time, the trustee's handicap increases, and even greater latitude should be afforded.

*Picard v. Cohmad Secs. Corp.,* (*In re BLMIS*), 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (cleaned up).

Because the Trustee has pleaded that BLMIS operated a Ponzi scheme, the Trustee's burden of pleading actual fraudulent intent is satisfied. (Am. Compl. ¶ 42– 62); (*id.* ¶ 28) ( Madoff pleaded guilty to operating a Ponzi scheme through BLMIS). The "Ponzi scheme presumption" allows courts to presume actual intent to defraud on part of the operator of the Ponzi scheme. *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud."). In this case, the Ponzi scheme presumption allows the Court to presume that BLMIS made the initial transfers with actual intent to defraud because Madoff has admitted to operating a Ponzi scheme.

The mere existence of a Ponzi scheme "demonstrates actual intent as matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Bear Stearns Secs. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 8 (S.D.N.Y. 2007)*.* The "Ponzi scheme presumption" makes perfect sense in cases such as this one. BLMIS had no legitimate assets and therefore every transfer made by BLMIS was made with actual intent to defraud in order to ensure that Ponzi scheme would survive.

The Trustee has pleaded that BLMIS operated a Ponzi scheme and as such, BLMIS'
actual fraudulent intent is presumed via the Ponzi scheme presumption.  (Am. Compl. ¶¶ 42–
62).   Intent to defraud is established as debtor operated a Ponzi scheme. *Picard v. Cohen*, Adv.
Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) (citing
*Omnibus Good Faith Decision*, 531 B.R. at 471) ("the Trustee is entitled to rely on the Ponzi
scheme presumption pursuant to which all transfers are deemed to have been made with actual
fraudulent intent"); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011)
("the fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law
by virtue of the 'Ponzi scheme presumption'").  That BLMIS operated as a Ponzi scheme is
well-established and the Court relies on earlier findings of same and holds that the Trustee has
met its burden of pleading BLMIS' actual intent on this issue.  *See Picard v. Legacy Capital
Ltd.*, 603 B.R. 682, 688-93 (Bankr. S.D.N.Y. 2019) (discussing in detail that BLMIS was a
Ponzi scheme and why the Trustee is permitted to rely on the Ponzi scheme presumption to
prove intent as a matter of law); *see also Bear Stearns Secs. Corp. v. Gredd (In re Manhattan
Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the
law of this Circuit.").

The Ponzi scheme presumption saves the Trustee and the courts time and resources by
presuming that each transfer was made with actual fraudulent intent.  Without the presumption,
Defendants would not be "off-the-hook" for the two-year transfers because the Trustee would
meet (and, in this case, has met) his pleading burden by pleading the "badges of fraud" with
respect to BLMIS.

> Badges of fraud include (1) the lack or inadequacy of consideration; (2) the
> family, friendship or close associate relationship between the parties; (3) the
> retention of possession, benefit or use of the property in question; (4) the financial
> condition of the party sought to be charged both before and after the transaction in

question; (5) the existence or cumulative effect of a pattern or series of
transactions or course of conduct after the incurring of debt, onset of financial
difficulties, or pendency or threat of suits by creditors; (6) the general chronology
of the event and transactions under inquiry.

*See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983). The "concealment

of facts and false pretenses by the transferor" is also a circumstance from which courts have

inferred intent to defraud. *Id.* at 1582 (quoting 4 *Collier on Bankruptcy* ¶ 548.02[5] at 548–34 to

38 (L. King 15th ed. 1983)). The existence of several badges can "constitute conclusive evidence

of an actual intent to defraud." *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent*

*Conveyance Litig.)*, No. 11-md-2296 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017)

(citation omitted); *Picard v. Nelson (In re BLMIS)*, 610 B.R. 197, 235 (Bankr. S.D.N.Y. 2019).

BLMIS' actual fraudulent intent is well-pleaded in the Complaint. (Am. Compl. ¶¶ 36–

62). The Court need not infer intent to defraud because Madoff has admitted that he had actual

intent to defraud when he admitted under oath that he operated a Ponzi scheme. (*Id.* ¶ 28). In

addition to this, the Trustee has alleged that "BLMIS's website omitted the I[nvestment]

A[dvisory] Business entirely. BLMIS did not register as an investment adviser with the SEC

until 2006, following an investigation by the SEC, which forced Madoff to register." (*Id.* ¶ 39).

For more than 20 years preceding that registration, the financial reports BLMIS filed with the

SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed

through its I[nvestment] A[dvisory] Business. (*Id.* ¶ 40). BLMIS lied to the SEC in reports

regarding the number of accounts it has and "grossly understated" the amount of assets under

management. (*Id.* ¶ 41). BLMIS had no legitimate business operations and produced no profits

or earnings. (*Id.*) "Madoff was assisted by several family members and a few employees,

including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and

others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud." (*Id.*

¶ 42).  BLMIS used its fraudulent investment advisory business to prop up its proprietary trading business, which also incurred significant losses.  (*Id.* ¶ 43).  "BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments."  (*Id.* ¶ 50).  "There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars."  (*Id.* ¶ 55).  "Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy."  (*Id.* ¶ 57).  "There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities."  (*Id.* ¶ 58).  Though unnecessary, the Trustee has sufficiently pleaded the badges of fraud.

The Trustee has successfully pleaded badges 2, 3, 4, 5, and 6.  The Trustee need not plead all six badges of fraud to meet his burden of pleading actual fraudulent intent.  *In re May*, 12 B.R. 618, 627 (N.D. Fla. 1980) ("Such indicators or badges, when established either singularly, but more often in combination, may justify the inference of the requisite intent to hinder, delay or defraud creditors.").

**BLMIS Customer Property**

The UBS Defendants argue that the Trustee has failed to plead facts that create a plausible inference that the subsequent transfers made to the UBS Defendants by the Feeder Fund Defendants consisted of customer property. Rule 8(a) governs the Trustee's pleading burden and a short and plain statement that the pleader is entitled to relief is all that is required. Fed. R. Civ. P. 8(a). This standard of pleading is meant to ensure that the defendant has proper notice of the claim, while recognizing the limitations a plaintiff may have in setting out each detail of the claim before discovery. *In re Enron Corp.*, No. 01-16034 AJG, 2006 WL 2400369, at *4 (Bankr. S.D.N.Y. May 11, 2006). In a subsequent transfer claim, this means only that a defendant must be adequately apprised of the subsequent transfers that the Trustee seeks to recover. *Picard v. Cohmad* (*In re BLMIS*), 454 B.R. 317, 340 (Bankr. S.D.N.Y. 2011) ("*Cohmad II*"). In the Complaint, the Trustee provides the UBS Defendants with the "who, when, and how much" of the purported transfers. *Cohmad II*, 454 B.R. at 340.

> 333. Based on the Trustee's investigation to date, the UBS Defendants received Subsequent Transfers, including but not limited to:
>
> a. UBS SA received at least $32.8 million in fees from Luxalpha for serving as the official custodian and official manager of Luxalpha from February 2004 to August 2006, and an additional $6.6 million in fees from Luxalpha for serving as the official custodian of Luxalpha from August 2006 to December 2008. UBS SA also received at least $1 million in fees from Groupement Financier for serving as the official prime bank of Groupement Financier from 2005 to December 2008, and at least $500,000 in fees from Groupement Levered for serving as the official custodian of Groupement Levered from 2005 to December 2008.
>
> b. UBSFSL received at least $2.5 million in fees from Luxalpha for serving as the official administrator of Luxalpha from February 2004 to December 2008. UBSFSL also received at least $497,000 from Groupement Financier for serving as the official administrator of Groupement and Groupement Levered from 2005 to December 2008.
>
> c. UBSTPM received at least $53.3 million in fees from Luxalpha for serving as the official manager of Luxalpha from August 2006 to November 2008.

(Am. Compl. ¶ 333).

The Trustee has alleged that Luxalpha was established entirely with BLMIS customer property that was withdrawn from the Oreades' BLMIS account. (*Id.* ¶ 4). And that the Feeder Fund Defendants invested 100% of their assets directly with BLMIS. (9/14/2022 Hr'g Tr. 74:25–75:4) ("[A]s to [Groupment and Luxalpha], they were . . . a hundred percent invested in Madoff."); (Am. Compl. ¶ 104) ("Groupement Financier . . . invested 100% of its assets directly with BLMIS."). The Trustee also alleges that BLMIS customer property accounts for 92% of Access' total revenue. (*Id.* ¶ 79). As such, any and all subsequent transfers made from the Feeder Fund Defendants to UBS Defendants are very likely comprised of BLMIS customer property.

 As has previously been stated by this Court,

> the Trustee is an outsider to these transactions and will need discovery to identify the specific subsequent transfers by date, amount and the manner in which they were effected. The Moving Defendants are a group of interrelated individuals and entities .... Whether they additionally received Subsequent Transfers of BLMIS funds from one another is a question to which they, and they alone, have the requisite information to respond.

*Picard v. Mayer (In re BLMIS)*, No. 08-01789, Adv. No. 20-01316, 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021).

These allegations provide more than enough detail to apprise the Access Defendants of the subsequent transfers the Trustee is seeking to collect.

**The "Good Faith/For Value Defense"**

### i.  *For Value*

The "value" that a subsequent transferee must provide is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548 B.R. 13, 37 (Bankr. S.D.N.Y. 2016) (citation omitted); *accord Enron Corp. v. Ave. Special*

Situations Fund II, L.P. (*In re Enron Corp.*), 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005).  In

addition, the "value" element under § 550(b)(1) looks to what the transferee gave up rather than

what the transferor received.   The UBS Defendants argue that the payments of BLMIS customer

property they received from the Feeder Funds were given in exchange for services provided.

     The Complaint alleges that the opposite is true—the UBS Defendants received fees for

pretending to provide services, which they knew to be done by BLMIS.  (Am. Compl. ¶ 204)

("The net effect of the operating procedures put in place for Luxalpha was to allow UBS SA and

UBSFSL, two sophisticated financial institutions that appeared to the public to be directly

involved in the operation of Luxalpha, to earn fees for serving in roles that actually provided no

real oversight or protection for Luxalpha's assets, and which provided BLMIS with the freedom

to manipulate reports as needed to perpetuate the Ponzi scheme."); (*id.* ¶¶ 206–07) ("When

UBSTPM became Luxalpha's management company, UBS continued to conceal the delegation

of the fund's management to BLMIS. . . . No . . . 'updated' prospectus disclosing Luxalpha's

delegation of management to BLMIS was ever provided. Nor did UBSTPM ever attempt to

exercise any 'supervision' or 'control' over BLMIS.").

     "Value" is Defendant's burden to plead and prove.  *Picard v. BNP Paribas S.A.* (*In re

BLMIS*), 594 B.R. 167, 198 (Bankr. S.D.N.Y. 2018).  Whether the Defendants gave value is a

question of fact to be resolved either at the summary judgment stage or at trial.  *Picard v.

Fairfield Inv. Fund* (*In re BLMIS*), No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL

3477479, at *9 (Bankr. S.D.N.Y. Aug. 6, 2021).

     ***ii.   Good Faith***

     The Trustee has alleged that UBS participated in assisting BLMIS with its fraudulent the

scheme.  (Am. Compl. ¶ 15) ("The Access Defendants and the UBS Defendants worked together

to extend Madoff's fraud to European investors, enriching themselves through the receipt of millions of dollars' worth of fees that—unlike their clients' funds—were not subject to the obvious fraud risk that Defendants knew Madoff posed.").

Where, in light of surrounding circumstances, a transferee should have known of the debtor's precarious financial condition, the transferee will be deemed to have taken in bad faith, unless an investigation into the debtor's financial condition actually discloses no reason to suspect financial trouble.  2 Bankruptcy Desk Guide § 19:105.  The District Court recently explained that good faith is a fact-intensive inquiry that almost always requires a trial: "The Second Circuit made clear in its decision in [*Picard v.*] *Citibank*[*, N.A. (In re BLMIS)*, 12 F.4th 171 (2d Cir. 2021), *cert. denied* No. 21-1059 (Feb. 28, 2022)] that the inquiry notice standard requires a 'fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees.'"  *In re BLMIS, LLC*, Dec. & Order, 20-cv-02586(CM) (May 2, 2022).  And that "such a fact-based determination can only be made based on the entirety of the factual record after discovery . . . ."  *Id.* (internal quotation omitted).

The burden of proving good faith falls squarely on Defendants and this Court cannot make a determination on Defendants' affirmative defense until after a fact-intensive inquiry. Discovery is required on this issue.

### iii. *Knowledge of the Voidability*

As has been stated many times in this decision, the Trustee has alleged that the UBS Defendants knew about BLMIS' fraud.   (Am. Compl. ¶¶ 12, 15[10]).

---

[10] The amount of references the Trustee's Complaint makes to UBS' knowledge are too abundant to cite in this decision.

Good faith is linked with whether one had knowledge of the voidability of the transfer. *Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171, 189 (2d Cir. 2021) ("[A] transferee does not act in good faith when he has sufficient actual knowledge to place him on inquiry notice of the debtor's possible insolvency."), *cert. denied sub nom. Citibank, N.A. v. Picard*, 212 L. Ed. 2d 217, 142 S. Ct. 1209 (2022).  Having determined that "good faith" cannot be found on the face of a complaint, the Court must deny the Defendant's motion on this element.  Additionally, § 550(b)(1) provides a defense to recovery making lack of knowledge Defendants' burden to plead and prove.  It is a fact-intensive inquiry that requires a three-step inquiry into 1) what the UBS Defendants subjectively knew; "whether these facts put [UBS] on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the [UBS]'s position to conduct further inquiry into a debtor-transferor's possible fraud; and whether "diligent inquiry by [UBS] would have discovered the fraudulent purpose of the transfer." *Id.* at 192.

It is not appropriate for the Court to resolve these factual issues at this stage of the litigation.

## Conclusion

For the foregoing reasons, the Access Defendants' motion to dismiss is denied. The Trustee shall submit a proposed order within fourteen days of the issuance of this decision, directly to chambers (via E-Orders), upon not less than two days' notice to all parties, as required by Local Bankruptcy Rule 9074-1(a).



**/s/ Cecelia G. Morris**

**Dated: December 27, 2022**
**Poughkeepsie, New York**

_____
**Hon. Cecelia G. Morris**
**U.S. Bankruptcy Judge**